# Lessee of Ralph Cherry *against* William Robinson.

One guilty of laches in not endeavouring to procure a survey on his application in the land office, shall be postponed.

One in possession of lands under a legal title, sells to a purchaser *bona fide* without notice; an equitable title by improvement shall not affect him, nor be received in evidence. After three trials in ejectment, court will stay proceedings.

EJECTMENT for a messuage and 337⅞ acres of land in Bullskin township.

The merits of this cause came on for trial the fourth time.

The now defendant commenced an ejectment for the lands in question, against Adam Hatfield in Bedford county, on which a verdict passed for the plaintiff in January term 1772, and judgment was entered thereon. He then renewed his ejectment, which was removed to the supreme court, and was tried October assizes 1788, when a verdict was given in the same way; and on a new trial being ordered by the court, a third verdict was had for the defendant at June assizes 1790, on which judgment was rendered for him.

The outlines of the case were as follow:

In 1767, Adam Hatfield chopped a few cabbin logs and girdled some trees on the crossings of Jacob's creek; and in the ensuing year, he cut more logs, deadened some timber, made some brush heaps, and collected a number of people together to raise a cabin for him; but they were prevented by a fall of snow.

On the 7th April 1769, he entered an application in the land office, for 300 acres of land, about two miles above Braddock's road, where it crosses Jacob's creek, on both sides of the said creek. In the month of April or May 1769, he raised a cabin on the land, and lived in it with his brother. In the fall of the same year, he applied to William Thompson, esq. deputy surveyor of the district, to survey his lands, but he evaded it for the present; understanding however, a few days afterwards, that *John Boyd, a deputy under Thompson, had surveyed his intended tract for James [*522 M'Elwaine, under a later order, he immediately complained of this conduct to Thompson, who excused himself as well as he could, promised to return the survey in dispute, and that he would enter a caveat for him, both which he neglected to do.

In 1785 Hatfield, having made considerable improvements on the lands, conveyed the same to the now plaintiff's lessor, in consideration of 100l., who continued in possession until lately, when the defendant by repeated encroachments, obliged him to become plaintiff in a new ejectment. In 1786, a survey was made by Alexander M'Clean, deputy surveyor, and

returned on Hatfield's application; and on the 29th November 1787, a patent issued to Cherry, in consideration of 33l. 10s.

The defendant claimed under an application in the name of James M'Elwaine, entered on the 13th June 1769, descriptive of the lands, a survey made by William Thompson on the 11th November 1769, containing 321½ acres, a conveyance from M'Elwaine to the defendant in consideration of 10l., dated 14th November 1769, and a patent issued to him 12th January 1771.

It appeared on the trial, that M'Elwaine's name was made use of in the application, for the joint benefit of a company, consisting of the said William Thompson, John Boyd, Joseph Erwin and Wendle Ourey. The defendant was present when the survey was made by Boyd, under the location of M'Elwaine, and knew that Hatfield was in possession and claimed the land. This survey was conducted with privacy on a Sunday, and from some circumstances it became probable, that it was not made until after the date of M'Elwaine's bill of sale.

After a full discussion of the merits by Messrs. J. Wood and Young for the plaintiff, and Mr. J. Ross for the defendant,

M'Kean, C. J. in his charge to the jury, stated the written and parol testimony very fully.

He then observed, that the plaintiff had given very material evidence, which had not been produced on the former trials. The requisition made to Thompson at an early day to make the survey, the co-partnership existing against the now plaintiff, and the knowledge of the defendant of the lands being in dispute before he purchased, were now first brought forward, and operated with great force in behalf of the plaintiff.

If the plaintiff had been guilty of laches, in not procuring a survey for a number of years, or endeavouring by proper means to procure one, he ought to suffer for his negligence. Diligence *in such matters, forms an essential feature in titles on locations; and the claimant who idly stands by, and suffers other surveys to be made without prosecuting his claim, shall be postponed. The knowledge of the defendant of the dispute, and of Hatfield's possession, were also material circumstances to be proved; because if one in possession, had a legal title, and had sold to a purchaser *bonâ fide* and without notice, an equitable title by improvement, shall not affect him, nor indeed ought it to be suffered to go to the jury in evidence. (Vid. Talb. Cas. 187, 258, 260. 2 Freem. 43. 3 Cha. Ca. 123. 2 Black. Com. 329, 337.

When the defendant purchased, he most probably bought the application only, and the survey was made afterwards. The bill of sale, in the hand writing of Boyd, one of the company, though very full in other particulars, does not specify

[Cherry's Lessee *v.* Robinson.]

the survey, or quantity of acres, though on the face of the paper it would appear the lines were run by Boyd himself, but three days before; and one of the witnesses swears that the survey was not made until the succeeding year.

Here then, independent of Hatfield's improvement, which need not be taken into view, the plaintiff has the earliest descriptive application; and his warrant, survey and patent, shall like the different parts of a common recovery, all refer back to the first act, and will therefore over-reach the defendant's title. He and Hatfield have been in uniform possession since 1769, until the defendant has by finesse, elbowed him out of part of the land. His title has been sanctioned by the verdicts of three successive juries, and no good reason has been offered to us, why he should not now succeed.

The jury found a verdict for the plaintiff, without leaving the bar. The court then told the defendant, that four different juries had united in opinion, concerning the title. It was high time, peace should be restored between them; but if he still meant to contend the right, and worry his adversary out, courts of justice would interpose their authority, and prevent him from dragging his opponent into further vexatious law suits. As equity would decree an injunction after three trials, so would courts in Pennsylvania, stay his further proceedings, by their summary powers, for the ends of justice. (Vid. Sel. Cha. Ca. Temp. King 13. 2 Equ. Ca. Ab. 522. 1 Wms. 672. 2 Bro. Parl. Ca. 217. 1 Stra. 404. Bunb. 158.

Referred to in 3 Binn., 189.